183 So.2d 473 (1966)
Shirley PHILLIPS, as Natural Tutrix of and For and In Behalf of her minor son, Kelvin Phillips,
v.
Sam COHEN and Connecticut Fire Insurance Company.
No. 2051.
Court of Appeal of Louisiana, Fourth Circuit.
February 7, 1966.
Rehearing Denied March 7, 1966.
*474 Arnold C. Jacobs, New Orleans, for plaintiff-appellee.
Hammett, Leake & Hammett, Robert E. Leake, Jr., New Orleans, for defendants-appellants.
Before McBRIDE, REGAN and SAMUEL, JJ.
SAMUEL, Judge.
Plaintiff filed this suit as natural tutrix of her minor son to recover damages for personal injuries sustained by the child as a result of being struck by falling plaster. Defendants, the owner-lessor of the building in which the accident occurred and his liability insurer, have taken this appeal from a judgment in favor of plaintiff in the sum of $8,500. Plaintiff has answered the appeal praying that the award be increased to $15,000.
The facts involving the accident itself are not in dispute. It occurred at about 7:30 p. m. on January 1, 1963, in a basement apartment in the City of New Orleans. The boy, seven years of age at the time, was lying in bed when a piece of plaster weighing approximately 15 pounds fell from the ceiling and struck him. Although the plaster covered all of the upper portion of his body, he was injured only in the area of the eyes. Both eyes, particularly the right one, were swollen and the right upper eyelid was cut. He was taken to Charity Hospital where his eyes were cleansed with a saline solution. The following day a representative of one of the defendants took the boy and his mother to an eye clinic where the child received treatment over a period of several months.
The apartment was rented by the plaintiff from the defendant-owner, under an oral lease on a month to month basis, approximately 18 months before the boy was hurt and was being occupied under that lease by plaintiff and her children as a residence at the time of the accident. The ceiling gave no appearance of being defective prior to the time the plaster fell; plaintiff did not know of its condition and neither did either the owner-lessor or his rental agent.
In this court defendants contend: (1) plaintiff had entered into a contract with the defendant owner-lessor by which she assumed responsibility for the condition of the premises and therefore under Act 174 of 1932, now LSA-R.S. 9:3221, there can be *475 no liability on the part of the defendants; and, alternatively, (2) the injury suffered by the child was minimal and the amount awarded is grossly excessive.
The statute upon which the first contention is based reads as follows:
"The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." LSA-R.S. 9:3221.
Under Louisiana law, particularly LSA-C.C. Arts. 670 and 2322, the owner-lessor is held to strict liability, i. e., liability without fault on his part, for personal injuries sustained as a result of the defective condition of the leased premises and he cannot successfully defend on the basis of ignorance of the condition of the building or of the fact that the defect could not be detected; knowledge of even latent defects for which he is responsible is imputed to the owner-lessor and he is presumed to know of them. Green v. Southern Furniture Company, La.App., 94 So.2d 508; Poss v. Brown, La.App., 73 So.2d 661; Thompson v. Suprena, La.App., 65 So.2d 801.
In the instant case defendants are liable unless, as they contend, a contract existed between plaintiff and the owner-lessor by which plaintiff assumed responsibility for the condition of the premises, thus making the quoted statute applicable. The contract contemplated by the statute may be either oral or written but the defendants have the burden of proving the existence of such a contract with legal certainty. Buvens v. Patrick, La.App., 85 So.2d 324; Ropollo v. Pick, La.App., 4 So.2d 839; Hoffman v. Zimmer, La.App., 175 So. 115.
The only evidence offered by the defendants to prove the existence of the alleged contract, and this is the only evidence contained in the record pertinent thereto other than testimony by plaintiff to the effect that the sole agreement she entered into was "* * * to pay $50.00 a month", are rent receipts, particularly the first receipt, given to the plaintiff when she paid the rent and the testimony of the owner-lessor's rental agent. The receipts were on a printed form bearing the name and address of the rental agency on the face thereof. Under that name and address there appeared, in smaller but legible print, the following inscriptions:
"Under this rental agreement, the tenant assumes responsibility for the condition of the premises, as provided in Act 174 of 1932.
Report all plumbing leaks immediately. Otherwise tenant will be charged for excessive water bills."
We have carefully examined all of the testimony given by the rental agent in question. He had no independent recollection of having rented the apartment to the plaintiff; nor did he remember whether or not he had shown her the apartment. He knew he had handled the leasing agreement only because of the fact that his initials appeared on the first receipt and he recognized those initials as being in his handwriting. His testimony is not as to what actually happened in any discussion which may have taken place between himself and the plaintiff at the time the lease agreement was entered into; he had no recollection of any such discussion. He did testify that, as a matter of ordinary procedure by himself and his office, the attention of the prospective tenant was called to the above quoted rental receipt provisions and that such procedure was taken because the agency wished to be notified of anything wrong with the premises. In considering all of this witness's testimony we are left with the impression that in this connection the agency was concerned primarily with the matter of bills for water and of keeping to a minimum *476 the amount of water used, or wasted by reason of leaks, because of the fact that such bills were paid by the lessor.
We conclude that the defendants have failed to prove the existence of a special contract between plaintiff and the owner-lessor and that therefore LSA-R.S. 9:3221 is not applicable in the instant case. The record is devoid of any evidence that plaintiff entered into a stipulation or agreement by which she assumed responsibility for the condition of the premises. And rent receipts, together with the inscriptions thereon, are not in themselves sufficient to constitute a special contract by which the tenant assumes responsibility for the condition of the premises and the owner-lessor is released from liability under LSA-R.S. 9:3221. Ropollo v. Pick, supra; see Marine Insurance Company v. Rehm, La.App., 177 So. 79; Lawes v. New Orleans Transfer Co., 11 La.App. 170, 123 So. 144; Comment, 16 Tul.L.Rev. 448, 453.

QUANTUM
In the early stages of his treatment at the eye clinic the boy was seen frequently, especially for the purpose of preventing infection. Swelling and excessive mucous were continually apparent. The boy complained of seeing "a blurry gray" with the right eye and of double vision. He appears to have made the same complaints at school, where he had been an exceptionally good student before the accident and only an average one after. The principal element of damage, of course, is the claimed loss of vision. It is defendants' contention that the boy has suffered no such loss.
The record contains the testimony of four ophthalmologists: Drs. Shelley R. Gaines, Robert Azar, Joseph W. Reddoch, Jr. and J. William Rosenthal. With the exception of Dr. Reddoch all were members of the American Board of Ophthalmology with many years of actual experience. Dr. Reddoch had been engaged in the practice approximately a year and a half following his residency and had not taken the Board. We also note that although Dr. Gaines testified to, and based his conclusion on, the results of numerous tests done under his supervision, he performed only one or two of those tests; the remainder were done by some other doctor. The three medical witnesses other than Dr. Gaines personally performed the tests. The extent to which some of these tests are reliable is related to the ability and experience of the person giving them.
Some examinations given by or under all of these physicians revealed that the boy had uncorrected vision in the right eye of 20/200 and 20/400, i. e., he could only see at 20 feet what a person of normal vision could see at 200 or 400 feet. All of the doctors were of the opinion that the boy had vision in the left or uninjured eye of 20/20, that his vision was 20/20 with both eyes open, and that the 20/20 vision with both eyes could be caused by the fact that with both eyes open the boy actually was using only his left eye.
A direct traumatic injury to the eye socket or orbit can cause blindness or impairment of vision without damaging the eyeball itself; it is possible that only the optic nerve may be damaged. In all probability an injury to the optic nerve in the instant case would be immediately behind the eye where it could not be seen by any means presently available to the medical profession. All of the medical testimony is in agreement on these facts.
However, with children the tests are likely to be variable and unsatisfactory. And whether the individual being examined is giving honest answers is always open to question where, as is true here with the single exception of a finding only by Dr. Azar of a pallor of the optic nerve head, which pallor might be a manifestation of injury to that nerve, the doctors could find no objective physical reason for the claimed loss of vision. Under these circumstances the ophthalmologist subjects the individual to a battery of tests for the purpose of determining whether or not he is malingering. Such tests were given to the boy.
*477 As a result of all of these tests Dr. Gaines was of the opinion that the boy had no vision defect in the right eye; Dr. Reddock was of the same opinion and felt that the boy might be malingering; and both Drs. Azar and Rosenthal were of the opinion that the boy had a profound impairment of the visual function of the right eye.
Dr. Azar felt the boy had less than 5% visual function in the right eye based on a visual acuity of less than 20/400. Dr. Rosenthal concluded that the boy had a vision of only 20/200, and a restriction of the visual field, in the right eye. Both Drs. Azar and Rosenthal were of the further opinion that the condition of the boy's right eye was compatible with the trauma sustained as a result of being struck by the falling plaster and they could find no other reason for the injury. Both were also of the opinion that the injury was permanent and would degenerate, i. e., become worse rather than improve, and that the loss of vision could not be corrected by the use of eye glasses or otherwise.
The trial judge found that the boy was not a malingerer; that he has a marked loss of vision, either 20/200 or 20/400, in the right eye which cannot be corrected; that he is industrially blind, i. e., for all practical purposes unemployable in many positions, having suffered a permanent loss of 95% (20/400) or 80% (20/200) of vision in the injured eye; that much of the peripheral vision to the right was lost; and that, although with both eyes open his vision is 20/20 because then he actually uses only his good left eye, he has lost his eye reserve with the obvious result should the left eye be damaged. We agree with the findings of fact by the trial judge.
In considering the question of quantum we follow the doctrine enunciated in the Supreme Court cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64, and Ballanga v. Hymel, 247 La. 934, 175 So.2d 274, and confine our review to determining whether there has been an abuse of the "much discretion" vested in the trial court in assessing damages, considering similar cases as relevant only for the purpose of determining whether there has been an abuse of that discretion.
All of the somewhat similar and comparatively recent cases concerned with loss of eyesight and quantum therefor which we have been able to find involve adults. Some of these cases are: Young v. Hearin Tank Lines, Inc., La.App., 176 So.2d 790 (1965), $45,000 for injuries resulting in cataract surgery involving both eyes, almost one year's total blindness, loss of peripheral vision, future medical expenses and loss of future earnings of 41 year old plaintiff (however, the amount of future earnings, a considerable item as mentioned by the court, is not given in the opinion); Tyler v. United States Casualty Company, La.App., 127 So.2d 804 (1961), increase of award to 30 year old plaintiff from $6,000 to $12,000 principally due to loss of sight of left eye because of detached retina; Theriot v. Gianelloni, La.App., 121 So.2d 275 (1960), $10,000 award to 45 year old plaintiff for injuries resulting in surgical removal of an eye; Prine v. Continental Southern Lines, La.App., 71 So.2d 716 (1954), $18,000 award to 22 year old plaintiff chiefly for injuries to the left eye resulting in double vision which rendered that eye useless and affected vision in the other eye; McDowell v. National Sur. Corp., La.App., 68 So.2d 189 (1953), $15,000 award to 28 year old plaintiff chiefly for injuries to an eye necessitating replacement with an artificial eye; Johnson v. Louisiana Coca-Cola Bottling Co., La.App., 63 So.2d 459 (1953), $12,500 award to 27 year old plaintiff for injuries requiring surgical removal of the left eye. We note that in determining quantum most of these cited cases consider the life expectancy of the injured party as a material factor. Obviously a child of only 7 years would have a longer life expectancy and, other things being equal, would be entitled to a larger award, than an adult for the *478 reason that he has been deprived of vision and will be handicapped for a longer period of time.
Other than Johnson v. Pickering Land & Timber Co., 132 La. 425, 61 So. 514, which involved the loss of an eye by a minor whose age is not given and which was decided more than fifty years ago (we note that even in Johnson the approved award was $6,000 for loss of an eye accompanied by inability to use an artifical eye and the fact that the other eye was affected), we have found only one case concerned with quantum for loss of eyesight by a small child. That case is Teissier v. Stewart, 11 La.App. 164, 121 So. 777, in which this court awarded $12,000 for injuries to a 9 year old child consisting of a badly lacerated lip, cheek and chin and the loss of an eye requiring the wearing of an artifical eye which affected the sight in the remaining eye. The Teissier case was handed down in 1929. It involved disfigurement as well as loss of vision. However, considering the generally increased awards for personal injuries in more recent years, the different economic conditions in 1929 as compared with those of the present, and the decreased value of the dollar (see Theriot v. Gianelloni, supra, 121 So. 279, and Prine v. Continental Southern Lines, supra, 71 So.2d 723), we are satisfied that the award in Teissier would have been much higher if made today.
We conclude that the trial judge did abuse the "much discretion" vested in him in awarding only $8,500 for the injury in the instant case and we are of the opinion that plaintiff is entitled to the award of $15,000 for which she prays in her answer to the appeal.
For the reasons assigned, the judgment appealed from is amended so as to increase the amount of the award from $8,500 to $15,000. As thus amended, and in every other respect, the judgment appealed from is affirmed; all costs in this court to be paid by the defendants-appellants.
Amended and affirmed.